IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 7, 2006

## STATE OF TENNESSEE v. TERRENCE MCCRAY[1]

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-00223    W. Otis Higgs, Jr., Judge**

---

**No. W2005-00479-CCA-R3-CD  - Filed September 5, 2006**

---

A Shelby County Criminal Court jury convicted the appellant of second degree murder, and the trial court sentenced him to fifteen years in confinement.  In this appeal, the appellant claims (1) that the evidence is insufficient to support the conviction; (2) that the trial court erred by refusing to declare a mistrial after a State witness's "theatrics"; (3) that the trial court committed plain error by not giving a curative instruction or declaring a mistrial after a courtroom spectator's outburst; (4) that the trial court erred by refusing to allow the defense to present evidence of the victim's prior arrest for domestic violence; (5) that the trial court erred by allowing the State to impeach the appellant with his prior arrests and letters written from jail; (6) that the trial court erred by allowing the State to cross-examine him about his statement to a police officer; (7) that the trial court committed plain error by allowing the prosecutor to testify during the State's closing argument; and (8) that the State committed plain error by implying during closing argument that the appellant had a duty to retreat before he could claim that he shot the victim in self-defense.  Upon review of the record and the parties' briefs, we affirm the judgment of trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Robert Wilson Jones and Phyllis Aluko (on appeal) and Kindle Nance and Robert Felknor (at trial), Memphis, Tennessee, for the appellant, Terrence McCray.

Paul G. Summers, Attorney General and Reporter; Leslie Price, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tom Hoover and Michael McCusker, Assistant District Attorneys General, for the appellee, State of Tennessee.

---

[1]Throughout the record, the appellant's first name is spelled "Terrance."  However, for the purposes of this opinion, we will use the name that appears in the indictment, "Terrence McCray."

**OPINION**

## I. Factual Background

This case relates to the appellant's shooting his girlfriend's uncle, Harpreett "Happy" Kaleka, on July 6, 2003. Tara Brown, the victim's niece, testified that the appellant dated her sister, Teresa Monger. In 1996, the victim had married Tara's and Teresa's aunt and the couple lived in Michigan.[2] On July 4, 2003, Tara's family celebrated the holiday at her mother's house in Memphis. The victim drove from Michigan to Memphis for the holiday, but his wife did not come with him. On July 5, Teresa and the appellant drove from their home in Mississippi to Memphis to visit the family. That evening, Tara; Teresa; their brother, Prince Monger; the victim; and the appellant went to Beale Street to celebrate Tara's birthday. However, security guards would not let Prince onto Beale Street because he was only nineteen years old, and the group decided to go to Harbor Town. Tara, Prince, and the victim drove to Harbor Town in the victim's car while Teresa and the appellant drove to Harbor Town in Teresa's car.

The group parked their cars in a dark parking lot next to the river. At some point, the victim asked Teresa to go to the store and buy beer for him. Teresa and the appellant went to the store, bought the beer, and returned to the parking lot. When the group got ready to leave, Prince was in the backseat of the victim's car, and Tara opened the door to get in the car. Teresa was standing near the victim's car, and the appellant was standing near Teresa. Tara testified that she heard the appellant say, "That n***** act like he don't like me." Tara asked Prince, "What did he say?" The appellant repeated the statement and, without warning, shot the victim in the back of the head. The victim immediately dropped to the ground. Tara said that the victim and the appellant had not talked to each other during the day and that she did not notice any ill feelings between them. After the shooting, the appellant pointed the gun and told Teresa to give him her car keys. Teresa threw down the keys, and the appellant got into Teresa's car. He threw the gun out of the window and drove away.

On cross-examination, Tara Brown testified that on the afternoon of the shooting, she, Teresa, the appellant, and the victim drove to Prince's place of employment to pick him up from work. They also went to a liquor store, where the victim bought two half-gallons of liquor. She stated that the victim bought the liquor for another family member and that she did not see the victim drink any of the alcohol. Later that evening, everyone drank a beer at Harbor Town. She said that she did not know why the victim's blood alcohol content (BAC) was .208 at the time of his death because she saw the victim drink only one beer. She said that she saw the appellant shoot the victim.

---

[2]Because two witnesses share the last name "Monger," we have elected to utilize first names for the purpose of brevity. We intend no disrespect to these individuals.

Prince Monger testified that on July 5, 2003, he spent the day working at a Kroger store. About 4:00 p.m., Teresa, Tara, the victim, and the appellant picked him up from work. Everyone was relaxed during the drive home, and Prince saw no interaction between the victim and the appellant. Later that evening, the group went to Beale Street. However, Prince could not get onto Beale Street because of his age. The group decided to go to Harbor Town to have fun and relax. When they got there, everyone started walking around and talking on their cellular telephones. At some point, Teresa and the appellant left to go to the store for beer. When they returned, Teresa and the appellant "stayed off to the side most of the time." The group got ready to leave, and Prince got into the backseat of the victim's convertible. The victim was standing between his open car door and the car, and the appellant was walking around. The appellant started pacing in a circle and said, "I don't think he likes me." The appellant pulled up his shirt, Prince saw a flash, and the victim dropped to the ground. Prince said that the appellant's hand was extremely close to the victim's head at the time of the shooting. On cross-examination, he testified that he never saw the victim and the appellant talk to each other.

Teresa Monger testified that she met the appellant in January 2003 and that she lived with him and his mother in Lambert, Mississippi. On July 5, 2003, she and the appellant drove from Lambert to her mother's house in Memphis. When they arrived, she introduced the victim to the appellant and told the victim that she and the appellant were going to be married the following month. Later, the appellant told Teresa that the victim liked her. About 6:00 p.m., Teresa, Tara, the appellant, and the victim went to pick up Prince from work. While they were waiting for Prince to come out of a Kroger store, the victim and Tara went into a nearby liquor store and the victim bought alcohol. Teresa never heard the victim and the appellant argue but heard the appellant ask the victim why he had slammed the car door.

Teresa Monger testified that the group went to Beale Street about 9:30 p.m. and then drove to Harbor Town. They parked their cars in a parking lot, got out, and looked at the river. About five or six other cars were in the lot. The victim asked Teresa to go to the store for him, and Teresa and the appellant drove to the store. They returned to Harbor Town, and everyone sat around and talked while the victim and the appellant each drank a beer. About midnight, the group got ready to leave. The victim opened his car door, and the appellant said, "This guy's got a problem with me." Teresa did not think the appellant was talking about the victim and told the appellant to "go and cool off." The appellant said he would and walked away. Tara and Teresa began looking at clothes in Teresa's car trunk and then walked toward the victim's car. The appellant closed the trunk of Teresa's car, Teresa heard a gunshot, and the victim fell in front of her. Tara and Prince said, "Terrance just shot Happy." The appellant told her to give him her car keys and pulled her arm. Prince took the keys from Teresa and threw them, and the appellant drove away. Teresa said that the victim and the appellant did not appear to be drunk and that she did not see the appellant shoot the victim. On cross-examination, Teresa testified that she did not remember seeing the victim drink alcohol on July 5.

Officer Shawn Keane of the Memphis Police Department testified that in the early morning hours of July 6, 2003, he was on patrol downtown and responded to a call that a person had been

shot. When he arrived at Harbor Town, witnesses told him that the appellant shot the victim in the head and fled the scene. At daylight, the police found a gun near the river. He said that none of the witnesses reported hearing the victim and the appellant argue.

Sergeant Robert Acred of the Memphis Police Department testified that he was dispatched to Harbor Town on July 6 to assist with the investigation. When he arrived, he began looking for a pistol but was not able to find it in the dark. At daylight, Sergeant Acred found a pistol along the rocky riverbank.

Officer David Payment of the Memphis Police Department testified that on July 6, he responded to a homicide at Harbor Town. He arrived at the scene about 1:00 a.m., took measurements, put up crime scene tape, and collected evidence. He also photographed the scene and collected a gun. He said that the neck of the revolver was broken and that he could not unload the pistol. Officer Payment later called a gunsmith to the police department's property room to unload the gun. The gun was a six-shot .22 caliber pistol and held five live rounds and one spent shell. He stated that the damage to the gun was consistent with the gun's having been thrown onto a solid object. On cross-examination, he said that to his knowledge, no fingerprints were recovered from the gun. He said that he did not know how long the gun had been outside or if the appellant had used it to kill the victim.

Sergeant Eddie Bass of the Memphis Police Department testified that he was called to the scene of the shooting and was one of the first detectives to arrive. Sergeant Bass learned from witnesses at the scene that the appellant was the suspected shooter and may be driving to Mississippi. Sergeant Bass broadcasted the appellant's name and a description of Teresa Monger's car over the police radio. While Bass was still at the scene, he learned that the appellant had been taken into custody by a Southaven, Mississippi police officer. Later, Sergeant Bass went to the Southaven police station to get the appellant's name, birth date, social security number, and address for an investigative report.

Memphis Police Department Sergeant Anthony Mullins testified that he was the coordinator in the case and took the pistol recovered from the scene to the Tennessee Bureau of Investigation (TBI) Laboratory. The TBI conducted ballistics tests on the gun and compared test-fired bullets to the bullet recovered from the victim. The TBI found that the markings on the bullet recovered from the victim were similar to the characteristics of the gun but could not say conclusively that the gun fired the bullet.

Dr. O.C. Smith testified that he was the Shelby County Medical Examiner at the time of the shooting and performed the victim's autopsy. The bullet entered the victim's head above his left ear, and the victim died of the wound. Dr. Smith found stipple on the victim's skin, indicating that the gun was within two feet of the victim when it was fired. He said that after the bullet entered the victim's brain, it broke into two pieces and lodged between the victim's brain and skull. The small caliber bullet traveled left to right and slightly upward. After the shooting, the victim would have been incapacitated but would have been able to breathe and swallow for a short time while his heart

continued to beat. On cross-examination, Dr. Smith testified that he could not say conclusively that the bullet was a .22 caliber. He said the victim weighed about two hundred nine pounds and had a BAC of .208. He said that assuming the victim had been drinking on an empty stomach over a two-hour period, the victim would have had to consume fourteen or fifteen alcoholic drinks to have a BAC that high. He said that a person becomes under the influence with a BAC of .05. He stated that the victim's autopsy revealed that the victim's liver cells were accumulating fatty material, indicating that the victim may have abused alcohol over a period of time. However, the victim did not have cirrhosis of the liver.

Cory Stevenson testified for the appellant that in the early morning hours of July 6, 2003, he was at a park in Harbor Town and was shooting fireworks. He heard "a little argument" and "hollering, it seemed like it got a little louder." Stevenson looked to see what was going on and saw the victim lying on the ground. He got in his car, drove closer to the scene of the shooting, and saw the victim lying next to the victim's car. On cross-examination, Stevenson testified that he was "a couple of cars" away from the shooting and heard hollering and screaming.

Sheralyn Williams-Burton, Cory Stevenson's finacee, testified that she and Stevenson were at the park about midnight on July 6. She heard "arguing, kind of frantic type tones." About ten minutes later, Williams-Burton heard women screaming and crying, and she and Stevenson drove closer to the scene. She acknowledged that it was fairly dark at the park and said that she never heard a gunshot.

Mary "Tina" Kaleka, the victim's wife, testified that the victim was the kindest man she had ever met. She said that the victim sometimes drank alcohol.

The appellant testified that he met Teresa Monger in 2002 and that they were going to be married in July 2003. On July 5, 2003, Teresa wanted the appellant to go with her to Memphis. The appellant did not want to go because Teresa had a spare tire on her car, and he thought the tire might be unsafe. The appellant did not want Teresa driving to Memphis by herself, so he finally agreed to go with her. When they got to Teresa's mother's house, Teresa introduced him to the victim. The victim gave Teresa money for a new tire, and Teresa and the appellant went to get the tire. When they returned to Teresa's mother's home about 3:00 p.m., the victim, Teresa, and Tara drank some wine. About 5:00 p.m., the appellant, Teresa, Tara, and the victim went to pick up Prince from work. While they were waiting in the car for Prince, the victim "was slamming the car door, like he didn't know whether he wanted to get out, or not." The victim slammed the car door two or three times, and the appellant asked the victim to stop slamming the door. The victim looked at the appellant "with a funny look" but stopped slamming the door. Tara and the victim got out of the car to go into a nearby liquor store, and the victim slammed the door again. The appellant told Teresa that the victim was acting drunk.

The appellant testified that the victim bought a gallon of gin and another bottle of brown liquor from the liquor store. Prince got into the car, and the group stopped by a convenience store, where Tara bought cups and ice. They poured liquor into the cups, drank on the way back to

Teresa's mother's house, and continued to drink at the home. About 9:30 p.m., the group drove downtown, with Tara, the victim, and Prince in one car and Teresa and the appellant in Teresa's car. When Prince could not get onto Beale Street, the group went to Harbor Town. The appellant and Teresa walked to the boat ramp to talk and then returned to the parked cars. The victim asked Teresa to get more beer, and Teresa and the appellant drove to the store. When they returned, the appellant, the victim, and Teresa each drank a beer. Teresa and Tara began looking in the trunk of Teresa's car, and the appellant sat down in Teresa's car. The victim walked up to the appellant and said, "What's up[?]" The victim then pointed his finger and said, "Who is you to tell me something" and "I'll kill you." The appellant thought the victim was mad at him for the appellant's having told the victim to stop slamming the car door earlier. The appellant stood up, and the victim said, "I'll kill you, you don't know me." The victim walked to his car and said, "Hold up." The victim opened his car door and bent down, and the appellant saw something in the victim's hand. The appellant said that he got scared and "just shot." He said that he had been carrying the gun for protection because he and Teresa would be driving back to Mississippi at night. He said that he got the gun from a relative and that he did not have a license to carry it.

The appellant testified that after the shooting, he threw the gun toward the river. He told Teresa that he was frightened and told her to take him home. Prince threw Teresa's keys at the appellant, and the appellant drove away. He said that he did not wait for the police to arrive because he was frightened and that he did not return to the scene because he "had just blanked out." On the interstate, a Southaven police officer stopped the appellant and told him to put his hands up. The officer put the appellant into his patrol car and drove the appellant to the police station. The appellant said that he had a prior Minnesota conviction for shoplifting.

On cross-examination, the appellant acknowledged talking with a police officer and that the officer asked for his name and address. However, he denied telling the officer that he shot the victim because he was overcome with jealousy. He acknowledged writing letters to Teresa from jail and that one of the letters said, "So please, sweetheart, just say no to the questions that you think will hurt me in the courtroom." He also acknowledged that in a second letter, he wrote, "You can say that you did not see me [shoot] that man and that would help me a lot, sweetheart." He said that he did not remember being arrested in 1995 or 2000 for second degree assault or being arrested in 1997 for aggravated robbery.

On rebuttal, Sergeant Eddie Bass testified that he went to the Southaven police station and asked the appellant his name, social security number, and birth date. He said the appellant became "very dramatic" and started crying. The appellant told Sergeant Bass that "Happy was moving in on my woman" and "I know he's been visiting my woman the last couple of days." The appellant told Sergeant Bass that he got mad but did not mean to shoot the victim. On cross-examination, Sergeant Bass testified that at the time of the appellant's statement, the appellant had not been charged with a crime and Sergeant Bass was only trying to get information about the appellant's identity. He said he never advised the appellant of <u>Miranda</u> rights but did not ask the appellant any questions about the case. He said that the next day, he wrote down the appellant's statement but lost

-6-

the writing. Although the appellant was charged with first degree premeditated murder, the jury convicted him of second degree murder, a Class A felony.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the conviction because the proof showed that he shot the victim in self-defense. He also contends that, at most, the jury could convict him of voluntary manslaughter, which is the "intentional or knowing killing of another in a state of passion produced by adequate provocation." See Tenn. Code Ann. § 39-13-211(a). The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the appellant's conviction for second degree murder, the State was required to prove that the appellant knowingly killed the victim. See Tenn. Code Ann. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

Taken in the light most favorable to the State, the proof at trial revealed that Tara, Teresa, Prince, the appellant, and the victim went to Harbor Town after Prince could not get onto Beale Street. There, the grouped talked and drank beer. Neither Tara, Teresa, nor Prince saw the victim and the appellant argue or exchange harsh words. However, the witnesses testified that the appellant appeared to be upset, pacing and saying that the victim did not like him. They also said that, without warning, the appellant shot the victim in the head. Officer Keane testified that none of the witnesses reported hearing the victim and the appellant argue. Sergeant Bass also testified that the appellant admitted shooting the victim because he was overcome with jealousy. Although one witness testified that she heard an argument about ten minutes before the shooting, she was not an eyewitness

to the shooting and was some distance away from the scene. Based upon the evidence, we conclude that the jury had ample evidence to convict the appellant of second degree murder.

The appellant contends that the jury should have found that he acted in self-defense. Self-defense is essentially a fact question for the jury. See State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). In this case, the appellant claimed that the victim walked to his car, bent down, and had something in his hand. However, the evidence showed that the victim was shot while he was standing beside his car, and no weapon was found on or near the victim. The jury, as was its prerogative, chose not to credit the appellant's theory of self-defense. We will not second-guess the factual determination of the jury.

### B. Tara Brown's "Theatrics"

The appellant claims that the trial court erred by refusing to declare a mistrial after Tara Brown's "theatrics" during her direct testimony. Although the trial court gave a curative instruction, the appellant claims that the instruction did not eliminate the prejudice caused by Tara's statements and behavior. The State claims that the trial court properly denied the appellant's request for a mistrial. We agree with the State.

During Tara's direct testimony, the State showed her a picture of the victim's car. According to the trial transcript, Tara began to sob uncontrollably. The judge told the jury to step out of the courtroom, and Tara said, "God why did he do it? God, why did he do it?" The trial court told the jury that it was going to recess for lunch. Meanwhile, Tara twice cried out, "God help us, Jesus. Please." The jury left the courtroom, and the trial court instructed a member of Tara's family "to try to control her." Tara then stated, "Why did you take him from us?" and fell onto the floor.

After lunch, the appellant requested a mistrial. The appellant explained to the trial court that Tara's "explosive display of emotions" had occurred while the jury was still in the courtroom and that Tara had fallen onto the floor while some of the jurors had been exiting the courtroom. The appellant argued that a mistrial was warranted because Tara's display had prejudiced the jury against him. The State argued that a mistrial was not necessary because the appellant had admitted to shooting the victim, and Tara's statement had not hurt the defense's position that the appellant shot the victim in self-defense. After a recess, the trial court overruled the appellant's motion for a mistrial, but gave the jury the following instruction:

> Ladies and gentlemen, the Court instructs you that in regard to the testimony of the last witness, Tara Brown, and her emotional outburst, the jury in no case should have any sympathy, or prejudice, or allow anything but the law and the evidence to have any influence upon you in determining your verdict. You should render your verdict with absolute fairness and impartiality as you think truth and justice dictate.

Tara's testimony resumed without further incident.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial court cannot continue without causing a miscarriage of justice. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and that decision will not be overturned on appeal absent a clear abuse of that discretion. State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)). The burden of establishing the necessity for a mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In this case, the record reflects that as soon as Tara started sobbing uncontrollably, the trial court said, "Let's take a recess" and told the jurors to step out of the courtroom. When the jury returned to the courtroom, the trial court instructed the jury that Tara's outburst was to have no effect on its verdict. The jury is presumed to have followed the instructions of the trial court. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). We conclude that the trial court did not err by refusing to grant the appellant's request for a mistrial. In any event, any error is harmless in light of the overwhelming evidence of the appellant's guilt. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

## C. Spectator's Outburst

The appellant claims that the trial court erred by failing to declare a mistrial or give a curative instruction after a courtroom spectator's outburst. The State claims that the appellant is not entitled to relief. We agree with the State.

During the appellant's direct testimony, there was an outburst by a courtroom spectator. The trial transcript does not reveal what the spectator said. The defense made no objection, and the appellant's testimony continued. Before the appellant's cross-examination, the trial court decided to take a recess. The trial court sent the jury out of the courtroom and told the audience, "Now, I'm going to give you a word of warning, if you cannot handle this trial, stay out. Stay out in the hall, if you can't handle it. I don't want any more of that to happen again."

Initially, we note that the appellant failed to move for a mistrial or request a curative instruction. Our rules do not require "relief [to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). The appellant also did not include this issue in his motion for new trial. See Tenn. R. App. P. 3(e). Thus, he has waived the issue. Nevertheless, he contends that this court should address his claim under the plain error doctrine. Tennessee Rule of Criminal Procedure 52(b) provides that this court may address "[a]n error which has affected the substantial rights of an accused . . . at any time, even though not raised in the motion for a new trial . . . where necessary to

do substantial justice." See also Tenn. R. Evid. 103(d). When determining whether an error constitutes plain error, the following factors should be considered:

> (a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). The presence of all five factors must be established, and consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Smith, 24 S.W.3d at 283. Furthermore, the error "'must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

In the instant case, the trial transcript does not reveal what the spectator said during her outburst, and the defense did not put on the record what occurred. Therefore, because the record does not clearly establish what occurred in the trial court, the appellant is not entitled to plain error relief.

### D. Victim's Prior Arrest

Next, the appellant claims that the trial court erred by refusing to allow the appellant to present evidence about the victim's prior arrest for domestic violence. The State claims that the trial court properly excluded the evidence. We agree with the State.

During Mary Kaleka's brief testimony, the appellant requested that he be allowed to question her about the victim's having a prior arrest for domestic violence in Michigan. In a jury out hearing, Kaleka testified that she and the victim had a great relationship but that they had "disagreements" about his drinking. The defense asked Kaleka if the victim had been arrested in 1998 and charged with domestic violence, and the following exchange occurred:

> A. Yeah. It wasn't domestic violence, he wasn't arrested for that.
>
> Q. He was not charged with domestic violence?

A. No, he was not.

Q. What was he charged with?

A. Actually, it was for him wanting to drive and he had something to drink and I just wanted him to drive safely and they considered it a domestic violence. He never hit me, ever.

Q. So if I had the charge from Michigan that said, domestic violence, this would be wrong?

A. Yes, it would be wrong.

The witness stated that the charge was later dismissed. The defense argued that, in light of the appellant's self-defense claim, the victim's prior arrest was relevant character evidence and admissible to show that the victim had a history of violence and was the first aggressor. The trial court ruled that the prior arrest was irrelevant, failed to show that the victim had a propensity for violence, and had no probative value. The trial court allowed the defense to introduce into evidence a copy of the arrest record for identification purposes. According to the arrest report, the victim was arrested on December 24, 1998, for "DOMESTIC VIOLENCE - SECOND OFFENCE NOTICE." In the appellant's brief, he states that the arrest did not appear to result in a conviction.

Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion." Tenn. R. Evid. 404(a); see also Tenn. R. Evid. 404(b). Nevertheless, if a defendant raises a claim of self-defense, then Tennessee Rule of Evidence 404(a)(2) "permits the defendant to offer proof of the victim's 'pertinent' character for violent behavior to help establish that the victim was the aggressor." Neil P. Cohen, et al., Tennessee Law of Evidence, § 4.04[5][c] (5th ed. 2005). However, pursuant to Tennessee Rule of Evidence 405(a), this substantive evidence may be established only by reputation or opinion and specific acts may be inquired into only on cross-examination. Id. Evidence of the victim's character, when used solely to corroborate the defendant's claim that the victim was the first aggressor, may be admitted during the direct testimony of a witness. See State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995); State v. Hill, 885 S.W.2d 357, 361 n.1 (Tenn. Crim. App. 1994); State v. Furlough, 797 S.W.2d 631, 649 (Tenn. Crim. App. 1990). Before proof of first aggression may be admitted, the following conditions must be satisfied:

1. Self-defense must be raised by the proof and not by the words and statements of counsel.

2. The trial judge must determine whether or not there is a factual basis underlying the allegations of tendencies of first aggression.

3. The trial judge must determine whether or not the probative value of the evidence is outweighed by the potential for unfair prejudice.

See Ruane, 912 S.W.2d at 781 (citing State v. Laterral Jolly, No. 02C01-9207-CR-00169, 1993 WL 523590, at *4 (Tenn. Crim. App. at Jackson, Dec. 15, 1993)).

Turning to the instant case, the appellant wanted to question Mary Keleka during her direct testimony about the victim's prior arrest. However, substantive evidence of the victim's violent behavior to show that the victim was the aggressor is only admissible on cross-examination. Moreover, the evidence was not admissible to corroborate the appellant's claim of self-defense because at the time of the jury out hearing, the self-defense claim had only been raised by counsel, not by any of the witnesses. We note that after the appellant testified, the defense pointed out that the issue of self-defense had been raised and asked to recall Mary Kaleka to testify about the victim's prior arrest. However, the trial court reiterated that Kelka's testimony did not support the appellant's theory that the victim was a violent person and was irrelevant. Given Kaleka's testimony that the arrest did not involve violence and did not result in a conviction, we agree with the trial court and conclude that it properly excluded the evidence. In any event, any error is harmless in light of the overwhelming evidence of the appellant's guilt. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### E. Appellant's Prior Arrests and Jailhouse Letters

The appellant claims that the trial court erred by allowing the State to impeach him with his prior arrests. He contends that the trial court's error was not harmless because the arrests were for crimes of violence and, therefore, were unfairly prejudicial. The appellant also claims that the trial court erred by allowing the State to impeach him with letters he wrote to Teresa Monger while he was in jail for the current offense. Regarding the prior arrests, the State contends that the appellant opened the door to impeachment by testifying that he had only a prior conviction for shoplifting. Regarding the letters, the State claims that impeachment was proper because the appellant was trying to suppress Teresa Monger's testimony. We conclude that the trial court did not err by allowing the State to impeach the appellant.

### 1. Prior Arrests

The appellant testified on direct examination that he had a prior conviction in Minnesota for shoplifting. The appellant's attorney asked him, "Have you been in trouble since then?" and the appellant said no. Before cross-examination, the State requested that it be allowed to question the appellant about a 1995 arrest for second degree assault, a 1997 arrest for aggravated robbery, and a 2000 arrest for second degree assault. The State argued that although none of the Minnesota arrests had resulted in a conviction, the appellant had opened the door by stating that he had no other problems with the law since his shoplifting conviction. The defense argued that the State had provided no notice of the appellant's prior arrests. The State claimed that the appellant lied during

his testimony and that prior notice was not required for impeachment. The trial court ruled that the State could ask the appellant about the prior arrests. On cross-examination, the appellant did not deny the arrests but said that he did not remember them.

Tennessee Rule of Evidence 608(b) provides that

> [s]pecific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination.

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). Also, if the witness is the defendant, the trial court must determine whether "the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 608(b)(3). However, "[i]f the witness makes a sweeping claim of good conduct on direct examination, that claim may open the door to cross-examination without pretrial notice and with a lower standard of probativeness, as rebuttal of the broad claim would itself tend to show untruthfulness." Tenn. R. Evid. 608, Advisory Commission Comments; see State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984); James Phillip Hunter v. State, No. 01C01-9805-CR-00216, 1999 WL 695554, at * 8 (Tenn. Crim. App. at Nashville, Sept. 9, 1999) (stating that the Petitioner opened the door to the State's cross-examining him at trial about other arrests when he testified that he had only one prior arrest); see also State v. Miller, 674 S.W.2d 279, 284 (Tenn. 1984) (stating that, generally, arrest records are inadmissible "unless the accused makes them admissible for impeachment in some manner, such as his testifying that he had never been arrested").

The appellant's attorney asked if he had been in any trouble since his shoplifting conviction, and the appellant said no despite his having prior arrests for second degree assault and aggravated assault. We agree with the State that once the appellant denied having any further trouble with the law, he opened the door to the State's cross-examining him about the arrests. Therefore, pretrial notice was not required. We note that in the appellant's brief, he argues that the State failed to turn over his prior criminal record as required by Rule 16, Tennessee Rules of Criminal Procedure. However, the appellant made no argument or cited any authority regarding this issue, and it is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (mandating that the appellant's brief shall contain an argument regarding the issues and why the issues warrant relief).

## 2. Jailhouse Letters

Before cross-examination, the State asked that it be allowed to question the appellant about jailhouse letters he wrote to Teresa Monger, and the trial court granted the State's request. During cross-examination, the appellant acknowledged that in letters to Monger, he asked her to "just say no to the questions that you think will hurt me in the courtroom" and "say that you did not see me [shoot] that man." The appellant argues that the letters were irrelevant because "the evidence is not sufficiently clear that the defendant was asking the witness to be untruthful" and, therefore, were not an attempt to suppress Monger's testimony. The appellant also claims that the letters were inadmissible because the State failed to turn them over to the defense as required by Rule 16, Tennessee Rules of Criminal Procedure.

Initially, the appellant has waived this issue because he failed to include it in his motion for new trial. See Tenn. R. App. P. 3(e). In any event, relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also Tenn. R. Evid. 403. "'Any attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred.'" State v. Maddox, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997) (citations omitted). We agree with the State that the appellant's letters reflect an attempt to suppress Monger's testimony.

Regarding the State's failure to turn over the letters pursuant to Rule 16(a)(1)(A), Tennessee Rules of Criminal Procedure, the appellant's attorney told the trial court that "we don't know what those letters have said. I believe that the state may have just received a copy of those." The trial court ordered the State to make copies of the letters and give them to the defense. The trial court also gave the defense "a moment" to look at the letters. Given that the State had just received the letters, it did not violate Rule 16. See Tenn. R. Evid. 16(a)(1)(A) (providing that, upon request, the State must allow the defendant to inspect and copy any relevant written statements made by the defendant "within the possession, custody or control of the state").

F. Appellant's Conversation With Sergeant Bass

The appellant claims that the trial court erred by allowing the State to cross-examine him about his telling Sergeant Bass that he shot the victim out of jealousy. He contends that his oral confession "had been suppressed previously by consent" and that he did not open the door to impeachment under the doctrine of curative admissibility. The State claims that the appellant opened the door to his conversation with Sergeant Bass. Although we agree with the appellant that he did not open the door to impeachment, we conclude that he is not entitled to relief.

On direct examination, the appellant testified that he talked with a police officer at the Southaven police station. The appellant stated, "It was a black officer, I don't know his name, though." The appellant acknowledged that the officer had testified earlier during the trial. On cross-examination, the following exchange occurred:

Q.      I'm going to ask you a few questions, not very many. When you talked to Sergeant Bass, when he talked to you, do you remember that, down in Mississippi?

A.      I remember talking to someone.

Q.      You gave him a statement; didn't you?

A.      He asked me, what's my name and --

Q.      And then you told him something about what happened out there; didn't you?

A.      No.

The State then asked that the parties approach the bench, told the trial court that it believed the defense had "open[ed] the door," and stated that it was "entitled now to ask him about what he said and then impeach him about what he said."

The trial court excused the jury, and the State questioned the appellant as follows:

Q.      You said you didn't give a statement to Sergeant Bass?

A.      Yes, sir.

Q.      Isn't it true that you told Sergeant Bass that you shot and killed Mr. Kaleka and that you were overcome with jealousy and then you broke down and cried?

A.      No, sir. I was crying. I didn't never -- when he asked me what's my name --

Q.      He never actually asked you what you did, you just told him that on your own; right?

A.      Not that I recall, sir.

Q.      Is it possible you did it?

A.      Not to my knowledge, sir.

The defense argued that it had not opened the door by simply asking the appellant if he had spoken with an officer. The trial court overruled the objection. When the State resumed cross-examining

the appellant in front of the jury, the State asked him if he told Sergeant Bass that he shot the victim because he was overcome with jealousy. The appellant stated, "No, sir, I don't recall that." After the appellant's testimony, the defense rested its case, and the State immediately called Sergeant Bass to testify on rebuttal about the appellant's confession.

As we will discuss in greater detail in the section below, the parties revealed during closing arguments that they had agreed prior to trial that they would not question the witnesses about the appellant's confession to Sergeant Bass.[3] Despite this agreement, the State asked the appellant on cross-examination if he told Sergeant Bass "about what happened out there." When the appellant said no, the State argued that this denial opened the door to its being allowed to question the appellant about his confession. We are puzzled as to how the State could claim that the appellant opened the door to the confession when it was the State who asked the appellant, in blatant violation of its agreement with the defense, if he had talked with Sergeant Bass about the shooting.

The State contends in its brief that the appellant opened the door to cross-examination "by testifying that he had a conversation with Sgt. Bass." However, we also agree with the appellant that he did not open the door to his confession under the doctrine of curative admissibility. In State v. Land, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000), this court expressly acknowledged our prior implicit adoption of the "doctrine of curative admissibility," stating that "'[w]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise [inadmissible] evidence in order to explain or counteract a negative inference raised by the issue defendant injects.'" Id. at 531 (citations omitted). In the instant case, Sergeant Bass had already testified during his direct testimony that he traveled to Mississippi and spoke with the appellant. Therefore, the appellant's simply stating that he spoke with an officer at the Southaven police station did not inject an issue into the case and did not result in an inference that prejudiced the State.

However, the question raised by the appellant is whether the trial court abused its discretion by allowing the State to cross-examine the appellant about his confession to Sergeant Bass. See State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) (stating that the admissibility of testimony is within the discretion of the trial court and will not be reversed absent an abuse of that discretion). In order for the appellant to have opened the door to his confession, the door had to be closed in the first place. The parties did not mention the agreement to the trial court until closing arguments, and the record is devoid of any evidence that the trial court was aware of the agreement prior to closing arguments. We are bewildered as to why neither party, particularly the defense, informed the trial court that the parties had agreed not to question the witnesses about the appellant's statement to Sergeant Bass when this issue arose. See Tenn. R. App. P. 36(a); State v. Skelton, 77 S.W.3d 791, 799 (Tenn. Crim. App. 2001) (prohibiting a party from "standing silent while the trial court commits an error in procedure, and then rely on that error to his or her own advantage at a later time"). In any event, without any information about the agreement, the trial court had no reason to believe that the door to the appellant's confession had been closed. Therefore, based upon the

---

[3]When entering such agreements, the parties should advise the trial court of the agreement and put the agreement on the record early in the proceedings.

information that the trial court had before it at the time of its ruling, we cannot say that the trial court abused its discretion by allowing the State to cross-examine the appellant about his confession to the officer.

## G. State's Closing Argument

The appellant claims that the trial court erred by allowing the State to inform the jury during its rebuttal closing argument that the State and the appellant had entered into an agreement not to question Sergeant Bass about the appellant's confession. The State claims that the trial court properly allowed it to explain why Sergeant Bass did not testify about the appellant's confession during its case-in-chief. We agree with the State.

During the appellant's closing argument, the defense stated the following:

> All you've got to do is watch the news. You know how many homicides are going on in Shelby County. So how is it that Sergeant Bass is able to remember, verbatim, that Terrance McCray was crying uncontrollably and what he said, word for word.
> So is Sergeant Bass a credible witness. He didn't say that the first time he testified. The first time he testified he's there to gather information. And there's a supplement to that --

The State asked to approach the bench and explained to the trial court that the reason it had not questioned Sergeant Bass about the appellant's confession during the State's case-in-chief was because the parties had agreed prior to trial that they would not question the witnesses about it. This was the first time that either party mentioned the agreement to the trial court. The State argued that it should be allowed to tell the jury about the agreement because the defense was implying that Sergeant Bass had lied about the appellant's confession. The trial court agreed with the State. During its rebuttal closing argument, the State told the jury the following:

> But, this defendant, guilty mind, or whatever, volunteered that information [to Sergeant Bass]. But, in an abundance of caution and because [Sergeant Bass] couldn't find that [written] statement that he made in that report he made, we agreed with the defense that we would not bring that up. We would not bring that up in our case in chief. The defense, the defendant decided to bring it up again. And decided to bring it up in a manner that we suggested to you that he had an opportunity to tell about it and said nothing.
> Ladies and gentlemen, that's just not fair play. And therefore, we could get back into that and that's why we did. We believe that what he said to that police officer was something that we could have proven, but because the [written] statement wasn't there, we decided and we elected to try to be as fair as we can to this defendant, and we

-17-

would not bring that up. We agreed with that with the defense and yet he wants to bring it up, again, in the context of, "Well, I didn't say anything bad".

Initially, we note that the appellant failed to raise this issue in his motion for new trial. <u>See</u> Tenn. R. App. P. 3(e). Nevertheless, he contends that the trial court's ruling constitutes plain error. <u>See</u> Tenn. R. Crim. P. 52(b). However, we agree with the State that the prosecutor's statements were made in response to the appellant's closing argument in which he challenged Sergeant Bass' testimony and implied that Sergeant Bass lied about the appellant's confession. Therefore, the trial court properly ruled that the State could tell the jury about its agreement with the defense.

### H. Duty to Retreat

Finally, the appellant claims that the State committed plain error by implying during closing argument that the appellant had a duty to retreat before he could claim self-defense. The State claims that it did not misstate the law and that any error was harmless because the trial court properly instructed the jury on self-defense. We conclude that the State erred but that the error was harmless.

During its closing rebuttal argument, the State said the following:

> Self defense does not equal a preempt to strike. Think about that. You can be afraid as you want to of a person, if you're not in imminent, immediate fear, or rather, fear of immediate, imminent bodily harm, or death, that means it's going to happen in the next second, that you don't have time to do something like, get away. You don't have time to do what the ordinary would do, try to talk the person out of it. It's so immediate you can't do anything, but just whatever you have to do, to kill the person, who's your assailant. That's self-defense.

The State argues that the prosecution was not suggesting that the appellant had a duty to retreat but was trying to explain to the jury that the appellant did not have a fear of imminent bodily harm at the time of the shooting.

The appellant failed to raise this issue in his motion for new trial. <u>See</u> Tenn. R. App. P. 3(e). In any event, in a self-defense claim, there is no duty to retreat before a person threatens or uses force. <u>See</u> Tenn. Code Ann. § 39-11-611(a). We agree with the appellant that the prosecutor's saying "you don't have time to do something like, get away" was a misstatement of the law regarding self-defense. However, the trial court gave the jury a self-defense instruction and told the jury that a person has no duty to retreat before using force. Generally, we presume that a jury has followed the instructions of the trial court. <u>See</u> <u>Butler</u>, 880 S.W.2d at 399. Therefore, we discern no plain error. <u>See</u> Tenn. R. Crim. P. 52(b).

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.


_____
NORMA McGEE OGLE, JUDGE